

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

|  |  |  |
|---|---|---|
| In re: Fertilizer Group Litigation | ) ) ) ) ) ) ) ) ) ) ) ) | C/A No. 7:01-1001-13 to 7:01-1907-13<br>C/A No. 7:01-3707-13 to 7:01-3742-13<br>C/A No. 7:02-1226-13 to 7:02-1232-13<br><br>MEMORANDUM IN SUPPORT OF<br>MOTION TO EXCLUDE TESTIMONY OF<br>COLIN J. BAYNES UNDER<br>*DAUBERT v. MERRELL DOW* |

## I. INTRODUCTION

On at least two prior occasions, the testimony of "air modeler" Colin Baynes has been ruled inadmissible under <u>Daubert</u> principles (or their state law counterparts) on the ground that the underlying data upon which Baynes' opinions were based was, itself, unreliable and inadmissible. In re Voluntary Purchasing Groups, Inc. Litigation, 2000 WL 1842779 (N.D. Tex. 2000); Martinez v. City of San Antonio, 40 S.W.3d 587 (Tex. Ct. App. 2001). This Court should do likewise because Baynes' proffered opinions in this case are again based on underlying opinions from another expert that are, themselves, unreliable and inadmissible.

## II. BACKGROUND

Colin Baynes is an engineer and "air modeler" whom Plaintiffs have designated to testify to how emissions from the IMC plant would have been dispersed through the air into various locations in the Plaintiffs' neighborhoods. Baynes' opinions regarding the location and amount of emissions transported to the Plaintiffs' neighborhoods are based entirely upon estimates of the



amount of emissions produced by the IMC plant that have been calculated by another of Plaintiffs' experts, John Roberts. (Ex. 1, Deposition of Colin J. Baynes at 19, 89-90.)

Taking Roberts' estimates of emissions from the IMC plant as the foundation, Baynes has modeled how those substances would have dispersed in the air. He calculated the amount of various substances that would have been transported to various locations in the Plaintiffs' neighborhoods, on the assumption that Roberts' emissions inventory was correct. (Ex. 1, Baynes Dep. at 20.) As discussed in IMC's separate Motion and Memorandum addressing the inadmissibility of Roberts' opinions, however, Roberts' emissions inventory is in fact exaggerated and wholly unreliable.

## III. DISCUSSION

An expert's opinion is not admissible if it is not grounded on sufficient and reliable data. Fed R. Evid. 702(1). The expert's opinion is not grounded on sufficient data if the data are faulty, untrustworthy, contradicted by other uncontested and unconsidered data, or otherwise incomplete or inadequate. "An expert opinion cannot sustain a jury's verdict when it 'is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable.'" Concord Boat Corp v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000) (quoting Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993)).

An expert may not rely on untrustworthy data. It is axiomatic that "[a]n analysis is only as good as the data on which it rests." Federal Judicial Center, Reference Manual on Scientific Evidence at 90 (2d ed. 2000). "District judges may reject opinions founded on critical facts that are plainly untrustworthy, principally because such an opinion cannot be helpful to the jury." Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1114 (5th Cir. 1991). A court may

exclude evidence if it is derived from a poorly managed study with faulty data collection. Evans v. Philadelphia Housing Auth., No. 93-5547, 1995 U.S. Dist. LEXIS 4309, * 16-17 (E.D. Pa. March 31, 1995). If the data are unreliable, an expert's analysis based upon the data is likewise inherently unreliable. See, e.g., Martincic v. Urban Redevel. Auth., 844 F. Supp. 1073, 1075-76 (W.D. Pa. 1994) (recognizing danger that meaningless statistics will mislead or confuse the jury), aff'd, 43 F.3d 1461 (3d Cir. 1994).

As noted previously, other courts on at least two separate occasions have applied these principles in excluding the opinions of Baynes on the same grounds now raised by IMC. The courts in both In re Voluntary Purchasing Groups, Inc. Litigation, 2000 WL 1842779 (N.D. Tex. 2000), and Martinez v. City of San Antonio, 40 S.W.3d 587 (Tex. Ct. App. 2001), excluded Baynes' opinions concerning the location and amount of contamination because the emissions estimates supplied to him by another of the plaintiffs' experts were, themselves, unreliable and inadmissible. In re Voluntary Purchasing Groups, Inc. Litigation, 2000 WL 1842779 at *5 (excluding Baynes' testimony because it was "inextricably linked" to the inadmissible testimony of plaintiffs' environmental engineering expert regarding levels of plant emissions); Martinez, 40 S.W.2d at 594 (same). The result in this case should be no different.

## IV. CONCLUSION

Colin Baynes' proffered opinions in this case are inadmissible because they are entirely dependent on emissions inventory estimates calculated by John Roberts that are, themselves, wholly unreliable and inadmissible. Accordingly, IMC respectfully requests that this Court exercise its "gatekeeping" function under Daubert and exclude the testimony of Baynes from trial.

Respectfully submitted:

**IMC GLOBAL, INC. and
IMC GLOBAL OPERATIONS, INC.**

By _____

| | |
|---|---|
| D. Alan Rudlin<br>(Virginia Bar No. 17010)<br>Manning Gasch Jr.<br>(Virginia Bar No. 12617)<br>Harry M. Johnson, III<br>(Virginia Bar No. 29144)<br>Christopher R. Graham<br>(Virginia Bar No. 36328)<br>Shawn A. Copeland<br>(Virginia Bar No. 38824)<br>HUNTON & WILLIAMS<br>951 E. Byrd Street<br>Riverfront Plaza, East Tower<br>Richmond, VA 23219<br>(804) 788-8200 | Beattie B. Ashmore<br>(Federal Bar No. 5215)<br>PRICE, PASCHAL & ASHMORE, P.A.<br>P.O. Box 10008 (29603)<br>644 E. Washington Street<br>Greenville, SC 29601<br>(864) 467-1001<br><br>**Counsel for IMC Global, Inc. and<br>IMC Global Operations, Inc.** |

4

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was sent via UPS Overnight mail the 6th day of August, 2002, to the following as counsel for Plaintiffs:

> Russell W. Heald, Esq.
> Hilliard & Heald, L.L.P.
> 550 Fannin, Suite 111
> Beaumont, TX 77701
>
> Byron E. Gipson, Esquire
> Johnson, Toal & Batiste
> 130 Centre Street
> Orangeburg, SC 29115

TAB 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

IN RE:                              )
FERTILIZER GROUP LITIGATION )C/A No. 7:01-1001-13 through
                            )C/A No. 7:01-1907-13 and
                            )C/A No. 7:01-3707-13 through
                            )C/A No. 7:01-3742-13


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

COLIN J. BAYNES, PH.D.

April 18, 2002

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


ORAL DEPOSITION of COLIN J. BAYNES, PH.D. produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 18th day of April 2002, from 9:19 a.m. to 1:53 p.m. before Debra A. Henderson CSR in and for the State of Texas, reported by machine shorthand at the offices of Engineering & Fire Investigations, 2218 Northpark Drive, Kingwood, Texas 77339 pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.


No. 1-52048

1    Q.    You mentioned that you had reviewed the
2  opinions of Mr. Kaltofen and Dr. Roberts.  Have you
3  relied on those opinions or any other opinions in
4  giving your expert opinion in this case?
5    A.    Well, I have relied upon Dr. Roberts' work,
6  yes.
7    Q.    In what respect?
8    A.    Insofar as his report includes emission rates
9  of the various chemicals emitted from the plant.
10   Q.    Have you relied on any other expert report in
11  any capacity?
12   A.    No.
13   Q.    All right, sir.  I have already entered as an
14  exhibit to your deposition your expert report, and I
15  would like for you to identify that as the expert
16  report that you submitted on March 21, 2002 in this
17  litigation.
18   A.    I assume what you are talking about is what
19  you handed me earlier, Exhibit No. 2?
20   Q.    Yes.  With the tabs on it.  I think it has
21  nine tabs.
22   A.    That's it, yes.
23   Q.    Does that report reflect the opinions you
24  intend to give at trial?
25   A.    Well, that's my opinions to date.

```
 1      Q.  At least as of today that reflects the
 2  opinions that you intend to give at trial, correct?
 3      A.  As of today, yes.
 4      Q.  Do you anticipate changing your opinions?
 5      A.  Well, I don't know whether I will or not.
 6      Q.  What circumstances might provoke you to change
 7  your opinion?
 8      A.  Is this a hypothetical question I suppose?
 9      Q.  Well, can you think of any circumstance that
10  might cause you to change your opinion from what you
11  have written in your supplemental expert report dated
12  March 21, 2002 based on anything you know today?
13      A.  Well, the only thing that I could think of at
14  the moment is any -- that might cause me to change my
15  opinion would be any changes in the -- in Dr. Roberts'
16  emission rates.
17      Q.  The emission inventory work that Dr. Roberts
18  did?
19      A.  Correct.  That would be -- here I'm talking
20  about changes in the quantification of the exposures.
21      Q.  All right, sir.  That's fair enough.  Is there
22  any opinion that you anticipate giving at trial or
23  intend to give at trial that is not contained in your
24  expert report?
25      A.  Well, again, I really don't specifically know
```

1    A.    Well, that's what it appears to be.  It says
2    it's uncontrolled emission.  I don't know whether
3    that's a rate and what units it's in.
4    Q.    Have you computed these numbers or did
5    Dr. Roberts?
6    A.    Dr. Roberts.
7    Q.    All of these?
8    A.    Yes.
9    Q.    Everything on this page?
10   A.    I did nothing.
11   Q.    Is the same true then of the second, third,
12   fourth pages of material behind Tab 4?  Those are all
13   Dr. Roberts' computations?
14   A.    Yes, they are.
15   Q.    Well, let's go on then to the fifth page which
16   is entitled in the block of information to the upper
17   right Hours of Operation - Acidulator.  Are you on the
18   same page I am?
19   A.    Yes.
20   Q.    Is that your data or Dr. Roberts' data?
21   A.    That's Dr. Roberts' data.
22   Q.    And he computed all of these or he estimated
23   all of these shifts and days per week and everything
24   else?  You just took this data and that's what you --
25   A.    Yes.

1    Q.    -- used in the model?

2    A.    I used this information to compile my own

3  emission rates.

4    Q.    Let's go on to the next page.  Hours of

5  Operation - Granulator.  Is that all Dr. Roberts' data

6  as well?

7    A.    Yes.

8    Q.    And the next page, now I think we're getting

9  into some of your original work here, aren't we?

10    A.    Right.  And what this is is Dr. Roberts' first

11  page to which I have added some calculations of my own.

12    Q.    Dr. Roberts' first page is reproduced in total

13  here at the top and you have --

14    A.    Just a minute.  Let me back up there.  I'm

15  sorry.

16          It's not Dr. Roberts' first page.  They

17  have got out of order here.

18    Q.    Well, I'm looking at Superphosphate Medium

19  Efficiency, High Throughput.  Is that what you are

20  looking at?

21    A.    I am.  And that is his third page actually.

22    Q.    All the information at the top of the page is

23  Dr. Roberts' and then as I read this, looking only at

24  some new numbers, the information which is below the

25  heading Dispersion Model Inputs is what you have added